UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1-8-13
```

---------------------------------------- X

Spanski Enterprises, INC.,                 :

      Plaintiff,       :

  -against-                        :  **10 Civ. 4933 (ALC)(GWG)**

           :  <u>**OPINION & ORDER**</u>

Telewizja Polska, S.A.,                    :

      Defendant.       :

---------------------------------------- X

**ANDREW L. CARTER, JR., District Judge:**

I. **Introduction**

  On June 24, 2010, Plaintiff Spanski Enterprises, Inc. ("SEI") filed a Complaint against

Defendant Telewizja Polska, S.A. ("TVP"). Plaintiff alleges that Defendant breached the

distribution contract entered into by the parties on December 14, 1994 ("Contract"). The

Contract was modified on November 4, 1999 ("First Addendum") and again on April 29, 2002

("Second Addendum"). Plaintiff filed the Amended Complaint on October 1, 2010, and

Defendant filed its Answer to Amended Complaint and Counterclaims on January 26, 2011.

  On August 15, 2012, Plaintiff filed a Motion for Partial Summary Judgment Dismissing

Defendant's Counterclaims. For the following reasons, Plaintiff's motion for summary judgment

is GRANTED in part and DENIED in part.

II. **Background**

  Plaintiff SEI is a Canadian corporation. SEI, together with its subsidiaries and affiliated

companies, distributes Polish-language television and radio content in North and South America

1

via satellite, cable television, and the Internet.  Defendant TVP is a corporation organized under the laws of Poland and wholly-owned by the Polish government.  TVP owns and operates Polish-language television channels, including *TVP Polonia* and *TVP Info*.  SEI and TVP entered into the Contract in 1994, whereby TVP granted SEI the right to broadcast programming of the television channel *TVP Polonia* in North and South America for an initial period of 25 years.  In exchange for distribution rights, SEI agreed to pay TVP royalties.  Five years later, the First Addendum was executed, granting SEI the further right to distribute *TVP Polonia* content over the Internet within North and South America.  In 2002, when the Second Addendum was executed, TVP granted SEI distribution rights to the programming of a second channel, *TVP Info*.  The Second Addendum specified that New York law governs the Contract.

## A. *The Prior Action and Settlement*

SEI commenced an action in this District on February 8, 2007 ("Prior Action") seeking to enjoin TVP from proceeding with an arbitration in Poland, requesting a declaratory judgment regarding SEI's rights under the Contract, and alleging copyright infringement, breach of contract, and breach of the covenant of good faith and fair dealing.  Spanski Enterprises Inc., et al. v. Telewizja Polska S.A., et al., No. 07-CV-0930 (S.D.N.Y. Feb. 8, 2007) (Lynch, J.).  The Prior Action was resolved through a Settlement Agreement dated August 11, 2009 ("Settlement Agreement").

The Settlement Agreement states, in pertinent part:

The following outlines the proposals of Spanski Enterprises, Inc. ("SEI") (and its related companies) in regard to the resolution of the dispute currently pending in federal court of New York, United States (the "New York Action").  While it is the intent of the parties to enter into more formal agreements, execution of this document by officers of both parties shall constitute a binding agreement among the parties as to the terms herein.  If the parties reach agreement on settlement as

2

outlined herein, the parties will execute a written settlement agreement, which would address the timing of the requisite dismissal, with prejudice, of the claims asserted in New York Action, together with the execution of mutual releases, confidentiality and mutual non-disparagement provisions.   The Settlement Agreement will include the following:

I.      Settlement Agreement

      A.      Representation that SEI is and has been in material compliance with the terms of the 1994 Agreement (as amended);

      B.      Stipulation as to the dismissal of the claims, counterclaims and third-party claims asserted in the New York Action with prejudice, with the sole exception being SEI's current motion for discovery-related sanction. This would include dismissal of SEI's claims for damages for copyright infringement against TVP for the prior distribution of TV Polonia via the internet in the Territory, the claim for damages by SEI against TVP for breach of contract for commencing the arbitration in Warsaw, and any claims for damages by TVP against SEI;

      C.      The terms of the settlement agreement shall remain confidential (subject to minor exception for reporting purposes);

      D.      Mutual non-disparagement provisions; and

      E.      The exchange of mutual general releases.

(Piskora Decl., Ex. 12, Dkt. No. 26-13.) No long-form agreement was signed by the parties.

## B. *The Pending Action and TVP's Counterclaims*

In the pending action, SEI maintains it has exclusive rights to remain the sole distributor of *TV Polonia* and *TV Info* programming in North and South America as conferred by the Contract, the First Addendum, and the Second Addendum and confirmed by the Settlement Agreement. (Am. Compl. ¶ 14.) SEI alleges within three weeks of the execution of the Settlement Agreement, TVP granted a multi-year license for distribution of *TV Polonia* programming to SEI's competitor. (Id. ¶ 16.) After filing the Complaint, SEI further alleges

3

TVP removed a popular television series entitled *Klan* from its programming while still allowing SEI's competitor to distribute the series in the United States. (Id. ¶ 19.)

TVP filed its Answer to the Amended Complaint and also pled two counterclaims. The first counterclaim alleges SEI failed to pay TVP royalties and other money due in exchange for the broadcast rights and failed to comply with other obligations owed to TVP under the Contract, the Addenda, and the Settlement Agreement.[1] (Ans. ¶¶ 8-12.) The second counterclaim alleges SEI willfully failed to comply with its contractual obligations, willfully failed to act in good faith towards TVP, and fundamentally and substantially breached the agreements between the parties. (Id. ¶¶ 14-16.) Thus, TVP seeks cancellation and/or rescission of the Contract, the First and Second Addenda, and the Settlement Agreement. (Id. ¶¶ 17-18.)

SEI makes the current motion before the Court, seeking partial summary judgment dismissing TVP's counterclaims.

## III.   Discussion

### A. *Summary Judgment Standard*

The Court shall grant summary judgment if the movant shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970). In testing whether the movant has met

---

[1] TVP initially stated its counterclaims were limited to after the Settlement Agreement; however, TVP later amended its interrogatory responses to specify that the counterclaims apply to the period from 1995 to 2019. (Wenger Decl., Ex. 16, Dkt. No. 30-16.)

this burden, the Court must resolve all ambiguities against the movant. Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The movant may discharge this burden by demonstrating to the Court there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986) (interpreting the "genuineness" requirement).

## B. *The Effect of the 2009 Settlement Agreement*

It is well-established that a Settlement Agreement containing a valid release forecloses a party's ability to litigate claims subject to that release. Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n, 655 F.3d 136, 142 (2d Cir. 2011) (citing Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 17 N.Y.3d 269, 276 (2011)); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd., 696 F.Supp. 897, 901 (S.D.N.Y. 1988) (citing Omaha Indem. Co. v. Johnson & Towers, Inc., 599 F.Supp. 215, 220 (E.D.N.Y. 1984) (applying New York law)); Najjar Indus., Inc. v. City of New York, 57 N.Y.2d 647, 648 (1982)).

SEI and TVP dispute the proper interpretation of the Settlement Agreement. Specifically, each contends the other was the proponent of the language in Clause 1A: "Representation that SEI is and has been in material compliance with the terms of the 1994 Agreement (as amended)." (Piskora Decl., Ex. 12, Dkt. No. 26-13.) TVP argues it has not waived the ability to assert claims accruing before the execution of the Settlement Agreement. The release in the agreement does not apply to its counterclaims, according to TVP, because it was not aware of the extent to which SEI had been underpaying it for royalties at the time of settlement.

The Settlement Agreement and release disposing of the Prior Action should be interpreted in accordance with the principles of contract law. Bank of New York v. Amoco Oil Co., 35 F.3d 643, 661 (2d Cir. 1994); Omaha Indem. Co., 599 F.Supp. at 219 (citing Mt. Read Terminal, Inc. v. LeChase Constr. Corp., 396 N.Y.S.2d 959 (App. Div. 4th Dep't 1977)). "[T]he initial interpretation of a contract 'is a matter of law for the court to decide.'" K. Bell & Assoc., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)). "To determine the terms of a contract a court must ascertain the parties' intent based on the language they used." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) (citing Slatt v. Slatt, 64 N.Y.2d 966, 967 (1985)). If the contract's language is unambiguous and has only one reasonable interpretation, the Court does not need to consider extrinsic evidence of the parties' intent. Am. Home Prod. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. 1984) (citing Breed v. Ins. Co. of N. Am., 413 N.Y.S.2d 352, 355 (1978)). "However, '[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper.'" Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985) (citation omitted).

The Settlement Agreement was intended as an outline of the terms to be set forth with greater detail in "more formal agreements." (Piskora Decl., Ex. 12, Dkt. No. 26-13.) Notwithstanding the lack of any long-form documents, the language in the Settlement Agreement is clear.  Clause IE calls for mutual general releases to be executed by SEI and TVP. General releases usually cover all claims and demands due at the time of execution unless specified rights or claims are excluded. See Kaul v. Hanover Direct, Inc., 296 F.Supp.2d 506, 517 (S.D.N.Y. 2004) (citation omitted) ("[A] 'general release' is a release that 'covers all claims and demands due at the time of its execution.'"); Melwani v. Jain, No. 02-CV-1224 (DF), 2004 WL 936814, at *6, 2004 (S.D.N.Y. Apr. 29, 2004) (concluding general releases cover all claims pending at the time of execution in an oral settlement agreement).  Further, New York law favors enforcement of valid releases. Medinol Ltd. v. Boston Scientific Corp., 346 F.Supp.2d 575, 603 (S.D.N.Y. 2004).

> When, as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear, . . . the intent of the parties [is] indicated by the language employed. When the words of the release are of general effect the release is to be construed most strongly against the releasor, and the burden is on the releasor to establish that the release should be limited.

Id. (quoting Middle E. Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 907 (2d Cir.1987)).

The fundamental principles of contractual interpretation instruct the Court to look to the entire document, giving each clause effect without assuming any clause is redundant or unnecessary. Scholastic, Inc. v. Harris, 259 F.3d 73, 83 (2d Cir. 2001) ("In determining whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'" (quoting Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094-

7

95 (2d Cir. 1993))).  In order to avoid making the general releases superfluous, Clause IB and

Clause IE are interpreted using their plain meanings.  Clause IB dismisses any claims with

prejudice from the Prior Action, and Clause IE releases all claims as of the execution date.  The

two provisions taken together create a bar for TVP's claims arising under the Contract before

August 11, 2009.

      When Clause IE is viewed in light of the circumstances surrounding settlement, it is clear

the intent of the parties was to release all claims between them arising under the Contract.  See

Ruskay v. Waddell, 552 F.2d 392, 395 (2d Cir. 1977), cert. denied, 434 U.S. 911 (1977) (stating

courts should look to the literal language and the circumstances surrounding execution when

determining the intention of the parties as to the scope of a release).  In this case, TVP's

counterclaims are substantially similar to those brought in the Prior Action.[2]  Their reinvention

after signing the Settlement Agreement does not avoid a valid release.  See A.A. Truck Renting

Corp. v. Navistar, Inc., 916 N.Y.S.2d 194, 196 (App. Div. 2d Dep't 2011)) ("Words of general

release are clearly operative not only as to all controversies and causes of action between the

releasor and releasees which had, by that time, actually ripened into litigation, but to all such

issues which might then have been adjudicated as a result of pre-existent controversies." (quoting

Lucio v. Curran, 2 N.Y.2d 157, 161-62 (1956))).  Additionally, the parties' desires to settle in

2009 and continue to maintain a contractual relationship with each other, as evidenced by Clause

II, support this conclusion.  The lack of any exceptions to the release undercuts TVP's argument

that its counterclaims are preserved.  See Ruskay, 552 F.2d at 395 ("It would have been a simple

---

[2] The counterclaims TVP filed in the Prior Action for damages against SEI included breach of contract based on, among other things, SEI's underpayment of royalties and failure to maximize subscribers. (Piskora Decl., Ex. 11, ¶ 132, Dkt. No. 26-12.)  In the current action, TVP's counterclaim for breach of contract alleges the same basis for breach; though, TVP claims different actions by SEI resulted in the breach. (Answer ¶¶ 8-12.)

8

matter to except the claim now asserted from the blanket language of release.  The absence of any such reservation leads us to the conclusion that none was intended.").

TVP argues it only intended to release the claims if SEI was in compliance with its obligations under the Contract, and now that it has discovered alleged non-compliance prior to the Settlement Agreement, TVP can assert claims accruing before 2009.  This argument not only defies logic but completely ignores the intention any reasonable party would objectively have in choosing to settle litigation. See Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 69 (2d Cir. 2005) (rejecting Plaintiff's interpretation of the contract as ignoring "common sense but also the objective, rational, and reasonable expectations of authors and publishers entering into arms-length agreements").  First, the Prior Action was predicated, in part, on SEI's non-compliance with the Contract.  Second, parties engage in settlement with the expectation of finality for pending issues and claims. See Playboy Enter. Int'l, Inc. v. On Line Entm't, Inc., No. 00-CV-6618 (DGT), 2004 WL 626807, at *9 (E.D.N.Y. Apr. 1, 2004) ("[T]here is a strong interest in the finality of judgments, especially when the parties have entered into a settlement agreement." (citing Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986))).  No reasonable party would intend to give up their rights to pursue claims permanently and completely and not hold the other side to a similar expectation.

TVP further attempts to escape the Settlement Agreement by claiming, at the time it was executed, TVP did not know or could not have known about SEI's underpayment of royalties. Even if it did not have complete information regarding its claims, TVP assumed the risk of losing a larger recovery at trial when it chose to settle, a condition of which was execution of a general release. See Ruskay, 552 F.2d at 395 n.6 ("[T]he risk that a party may forfeit a huge judgment by premature settlement is simply one of the hazards of litigation, just as is the

possibility that one may pay a great deal to settle a claim which turns out to be entirely unfounded.").

The Second Circuit has concluded a party's judgment in hindsight that a more favorable settlement was owed to it does not permit the setting aside of a valid release. Id. at 395 ("[T]he understandable desire of the plaintiffs for a larger recovery in no way limits the scope of the release they gave in an arms-length transaction."); Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir. 2007) ("When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that a choice simply because his assessment of the consequences was incorrect."). Where, as here, the language of the agreement is clear, it will be given effect in spite of one party's claim that something else was intended. Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc., 23 F.3d 55, 58-59 (2d Cir. 1994) (citing Thailer v. LaRocca, 571 N.Y.S.2d 569, 571 (App. Div. 2d Dept. 1991)). When TVP executed the Settlement Agreement and release, it voluntarily withdrew the ability to litigate its claims against SEI without exception or condition. If the Court permits TVP to assert claims in this action that it had already willfully given up, the binding Settlement Agreement would be powerless.

Accordingly, the Settlement Agreement, which is clear and unambiguous on its face, and the release contained therein, extinguished the claims held by TVP against SEI as of the date of execution. Therefore, the Court dismisses the portions of TVP's counterclaims that accrued prior to August 11, 2009 as barred by the Settlement Agreement.

## C. *Breach of Contract Counterclaim*

SEI moves for summary judgment on the remainder of TVP's breach of contract counterclaim, arguing that: (1) TVP cannot establish SEI breached the Contract because TVP's

10

Rule 30(b)(6) designee admitted at deposition that there was no factual basis for the counterclaim, (2) TVP cannot establish breach through its experts because their testimony contradicts the testimony of TVP's Rule 30(b)(6) witness, and (3) TVP failed to provide notice of breach and an opportunity to cure as required by the Contract.

In order to prove a prima facie case for breach of contract under New York law, the claimant must establish: (1) a contract existed; (2) performance by one party; (3) breach by the other party; and (4) damages resulting from the breach. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994) (citing Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co., 612 F.Supp. 134, 137-38 (S.D.N.Y. 1985)); Arbitron Inc. v. Tralyn Broad., Inc., 526 F.Supp.2d 441, 447 (S.D.N.Y. 2007) aff'd, 327 F. App'x 755 (2d Cir. 2009).

i.    *TVP's Rule 30(b)(6) Corporate Designee*

After receiving notice of the issues to be addressed, Rule 30(b)(6) requires a corporation to designate one or more individuals who can testify at a deposition about information known or reasonably available to the organization relating to the proposed subject matter. Fed. R. Civ. P. 30(b)(6). "To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf." Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 268 (2d Cir. 1999) (citation omitted). "[I]t is settled law that a party need not produce the organizational representative with the greatest knowledge about a subject; instead, it need only produce a person with knowledge whose testimony will be binding on the party." Rodriguez v. Pataki, 293 F.Supp.2d 305, 311 (S.D.N.Y. 2003). Where corporate parties have failed to comply with the requirements of Rule 30(b)(6), the Second Circuit has upheld a district court's power to preclude

11

evidence. <u>See Reilly</u>, 181 F.3d at 268 (affirming the district court's order barring two witnesses from testifying at trial because the Defendant did not produce them for deposition but rather, produced a third person who was not knowledgeable about the subject); <u>Daval Steel Prods., Div. of Francosteel Corp. v. M/V Fakredine</u>, 951 F.2d 1357, 1363 (2d Cir. 1991) (affirming the district court's precluding a defendant from offering contrary evidence after failing to comply with an order regarding the production of witnesses and documents).

Ms. Nadolna was deposed on November 9, 2011 with a Polish interpreter present. During the deposition, she was asked to review the Answer to Amended Complaint and Counterclaims filed by TVP in this case. (Nadolna Dep. 44:4–6.) SEI's attorney proceeded to ask Ms. Nadolna if she had seen the document before, to which she responded "No." (<u>Id.</u> at 44:7–9.) Ms. Nadolna was asked whether anyone at TVP reviewed the document prior to its filing, and she answered she did not know. (<u>Id.</u> at 44:16–19.) After further questioning, Ms. Nadolna was then directed to review TVP's first counterclaim for breach of contract. (<u>Id.</u> at 47:17-24.)

> Q. Ms. Nadolna, do you have any knowledge or evidence in January of 2011 that Spanski Enterprises had failed to pay Telewizja Polska any monies due?
> A. On that date no knowledge.
> Q. Okay. Was there anyone at the company who had such knowledge?
> A. I don't know.
> Q. Okay. What monies does Telewizja Polska claim that Spanski Enterprises has failed to pay Telewizja Polska?
> A. I don't know. How can I?
> Q. I'm sorry.
> A. I don't know.
> ...
> Q. Well, are you aware of any evidence that Telewizja Polska has that Spanski Enterprises has failed to pay it money that is due to Telewizja Polska?
> A. I don't know.

(Id. at 50:9-51:13.) Questioning continued in a similar manner regarding the second counterclaim and the evidence TVP had to support the allegations contained therein. (Id. at 52:15-55:14.) Ms. Nadolna continued to respond, "I don't know." (Id.)

As the Rule 30(b)(6) corporate deponent, Ms. Nadolna's testimony at her deposition is binding upon TVP. Reilly, 181 F.3d at 268; Crawford v. Franklin Credit Mgmt. Corp., 261 F.R.D. 34, 38 (S.D.N.Y. 2009); Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya, 248 F.R.D. 126, 152 (S.D.N.Y. 2007). However, SEI seemingly imputes statements to Ms. Nadolna that are not in the transcript. At no time did Ms. Nadolna agree, or admit, that TVP's counterclaims are factually baseless. She consistently maintained that she did know the answer to the question or did not personally have evidence to prove or disprove TVP's counterclaims. (Nadolna Dep. 53:25-54:2-3.) Despite the lack of any admission in the deposition testimony, SEI seeks to preclude TVP's experts' opinions as contradictory to the testimony of Ms. Nadolna. Since Ms. Nadolna did not make any admissions regarding TVP's counterclaims, her testimony neither single-handedly defeats TVP's breach of contract claim nor precludes the expert testimony TVP offered.

ii.   *Alleged Breach by SEI*

The parties do not dispute the existence of a binding contract between them or that there has been performance on that contract. Instead, SEI argues TVP cannot establish a genuine issue as to any material fact demonstrating SEI breached the Contract. The Court has already concluded the Settlement Agreement bars all claims prior to August 11, 2009; therefore, only evidence of breach after the execution of the agreement is relevant to the inquiry. Any dispute of fact is construed against SEI, as the movant.

With respect to the first counterclaim, TVP alleges SEI breached the contract by failing to maximize subscribers.  However, there is no provision regarding expectations to maximize subscribers in the Contract, the First Addendum, the Second Addendum, or the Settlement Agreement.  Section 5 of the Contract specifies methods of distribution and expected subscriber volume *before* broadcasting begins:

> 1. SEI undertakes to broadcast the Program via satellite, cable connections and other currently known and as yet unknown television signal distribution technologies.  Decisions as to distribution technologies for Program broadcast within the Territory will be at the sole discretion of SEI.
> 2. SEI undertakes to:
>    - recruit 25,000 (twenty-five thousand) subscribers before the start of Program broadcast;
>    - begin continuous Program broadcasting until no later than 12/1/1995.

(Piskora Decl., Ex. 5, Dkt. No. 26-6.)

Although the Contract does not state an on-going expectation to maximize subscribers, the obligation still exists. This issue was addressed in the Prior Action by Judge Lynch during oral arguments on cross motions for summary judgment:

> Although there is no express agreement on Spanski's part to do anything in particular to market the programs, TVP is right that under New York law there is an implied best efforts obligation on the part of an exclusive licensee to use reasonable efforts to market the product or service to which it has exclusive rights.

(Piskora Decl., Ex. 20, Tr. Mar. 16, 2009, 43:8-13, Dkt. No. 26-21.)  SEI has an implied obligation, as the exclusive licensee, to use reasonable efforts to market and distribute TVP's programming in hopes of maximizing subscribers. See BLD Prod., LLC v. Viacom, Inc., No. 10-CV-2625 (PGG), 2011 WL 1327340, at *7 (S.D.N.Y. Mar. 31, 2011) ("Even where a contract does not reflect an express promise, however, courts will sometimes find an 'implicit agreement' that a party will use reasonable efforts to bring about profits, at least where the contract grants exclusive distribution rights to the defendant . . . .").

14

TVP's evidence that SEI failed to use reasonable efforts to maximize subscribers includes deposition testimony and reports of Gary Arlen and Ivan Reyes. Mr. Arlen has been employed in the media industry for forty years as an editor, analyst, and consultant. (Wenger Decl., Arlen Rept., Ex. 10, p. 1, Dkt. No. 30-10.) He has worked as a consultant to cable, telephone, satellite, and publishing companies, as well as TV networks and film studios. (Id.) Due to his extensive experience, Mr. Arlen is familiar with industry practices in the deployment of TV programming to specialty audiences, and Mr. Arlen has published at least six articles on marketing, programming, production, and distribution of video content on multiple platforms. (Id. at 1-2.)

Mr. Arlen opined that SEI failed "to adequately distribute TVP programming in the Territory consistent with the purpose of [the Contract] . . . to maximize viewership . . ." (Id. at 5.) "[A]s of the beginning of 2006, ten years after SEI began distributing TVP programming, SEI should have achieved a minimum of 150,000 television and internet subscribers . . ." (Id. at 19.) In support of this conclusion, Mr. Arlen assesses the rise in popularity and growth of specialty ethnic channels in the 1990s and 2000s. (Id. at 20.) He finds, based on studies of varying nationalities, viewers are "increasingly seeking content and language programming from their homelands." (Id. at 21.) Further, programming distributors are aware of and have responded to the increasing demand for foreign language and ethnic content. (Id. at 22.) "The industry's awareness of the value of ethnic markets, combined with growing digital capacity to deliver more channels, has made it easier for specialty distributors such as SEI to create affiliate relationships to expand the market for TVP channels." (Id.) "SEI's failure to seek and create distribution deals with more cable and satellite companies represents a lost opportunity to capitalize on the increasing appetite for foreign-language programming during this period." (Id. at 23.)

Mr. Arlen also offered conclusions in his report about SEI's deficient efforts to deliver content to high-speed internet customers. He tracks the growth of high-speed broadband service in American households since 2000 and the increased demand for Internet-delivered video. (Id. at 23-24.) Since the majority of the Polish-American market is located near urban centers, Mr. Arlen suggests they would have access to video services through the Internet. (Id. at 24.) "By achieving less than only 15,000 internet subscribers, SEI has completely failed to exploit opportunities to distribute TVP's programming content via this important growing platform." (Id. at 25.)

Explaining his conclusion that SEI should have achieved 150,000 television and internet subscribers by 2006, Mr. Arlen estimates there are approximately 10 million people of Polish descent in the United States and Canada based on various census data. (Id. at 26.) An estimated 2.5 to 3 million people of that population speak Polish. (Id.) Five to six percent of the Polish-speaking population represents 150,000 subscribers, the minimum level Mr. Arlen estimated SEI should have achieved. (Id.) "Having presently achieved only 45,000 subscribers, less than 2 percent of people in the Territory that speak polish, SEI has failed to meet minimum industry expectations for reaching this potential audience." (Id.)

Ivan Reyes is TVP's expert on website design. Mr. Reyes has over twenty years of industry experience and has owned and managed his own full service digital media and design production studio for over fifteen years. (Wenger Decl., Reyes Rept., Ex. 12, p. 1, 6, Dkt. No. 30-12.) His studio mainly provides streaming video consulting services to large companies. (Id. at 1.) Prior to founding his company, Mr. Reyes worked as a Motion Graphics Producer and Presentation Graphics Producer for Coca-Cola. (Id.) Mr. Reyes's experience includes working with compression software and hardware for video encoding in various formats, and his

16

computer skills include digital illustration, digital video editing, motion and presentation graphics, 3D animation, programming and design, web graphics, audio, and web application development. (Id. at 1, 5-6.)

After examining SEI's website,[3] Mr. Reyes found six areas of deficiencies, and "[c]ombined, these deficiencies amount to a poorly-designed, hard-to-use, non-user-friendly website." (Id. at 1.) The six areas are: (1) limited distribution platform, (2) lack of a mobile version, (3) video quality issues, (4) no search engine optimization, (5) poor user interface, and (6) No Spanish/Portuguese language versions. (Id.) Mr. Reyes stated the website is incompatible with Firefox, Google Chrome, and Safari – which, combined, make up 78% of the web browser market – without installing plug-in software. (Id. at 2.) Further, the website is not compatible with non-Windows based mobile devices and lacks a mobile-optimized version. (Id.) "While most video sites offer higher quality versions of their content, with encoding settings superior to DVDs . . . [SEI's website's] highest quality offering is equivalent to slightly less than VHS quality video." (Id. at 2-3.) Mr. Reyes also concluded poor search optimization does not allow a search engine to find the website using popular search terms. For example, users can find the website using its name; however, if a user enters the terms "Polish Television" or "Polish TV" into Google, the website will not appear anywhere in the first five pages of results. (Id. at 3.) Lastly, the website does not allow users to easily view lists of new and available programming, and there are no Spanish or Portuguese versions for South American users. (Id.)

SEI mainly challenges evidence offered by Mr. Arlen. Since he, according to SEI, did not undertake any analysis or offer any opinion as to SEI's efforts to distribute the licensed

---

[3] SEI's website refers to www.tvpolonia.com, the website maintained by SEI as a platform to distribute TVP programming in North and South America.

programming, Mr. Arlen's opinions should be excluded as a matter of law.  Moreover, SEI

argues Mr. Arlen did not perform any analysis for the period after 2009.  SEI also contends, in a

footnote, Mr. Arlen did not follow the generally accepted methodology for evaluating an

exclusive licensee's obligation to use reasonable efforts to maximize subscribers.  Accordingly,

SEI believes his opinion is "pulled from thin air" and "ignored other relevant considerations"

warranting exclusion.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion

for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  District courts

have broad discretion in determining whether or not evidence should be admitted. Id. at 65.

"The court should admit specialized expert testimony if the witness is 'qualified as an expert by

knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact

to understand the evidence or to determine a fact in issue.'" Nora Beverages, Inc. v. Perrier

Group of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998) (quoting Fed. R. Evid. 702).

During his deposition, Mr. Arlen acknowledged his report did not address certain factors

he deemed relevant to a complete analysis of TVP's counterclaim.

> Q. Okay. In your report, Arlen Exhibit 1, you would agree with me, would you
> not, that you didn't do an analysis of the price factor, did you?
> A. That is correct.
> ...
> Q. Would the price of SEI and its affiliates' subscription-based programming
> models be relevant to your opinion concerning SEI's failure to maximize
> subscribers?
> A. Yes, it would be relevant.
> Q. Okay. In discussing this issue of price, you mentioned other variables and you
> mentioned other factors.  What are those other variables or factors?
> A. The competitive factors of what else is available; the value of the perceived
> content, with an emphasis on perceived value of content; in the case of cable or
> satellite distribution, tiered pricing . . .

(Arlen Dep. 44:17-45:16.)  Mr. Arlen indicated he did not include an analysis of competitive

factors or pricing in his report. (Id. at 46:5-15, 54:5-21.)  When asked about the manner in which

SEI distributes TVP programming, Mr. Arlen said he looked at the issue but did not discuss it in

his report. (Id. at 110:8-111:19.)

> Q. Would it be fair to say you offer no opinion as to the efforts of SEI and its
> affiliates to distribute the licensed programming in either North or South
> America?
> A. Well, that's not completely fair to say that.
> Q. Okay. What in your report goes to the efforts that SEI and affiliates actually
> undertook to distribute the program?
> A. At the very least the conclusion that SEI and its affiliates, which I'll call "SEI"
> has achieved such a low distribution level, in my opinion, reflects that they didn't
> -- SEI did not aggressively market or distribute the services in North America --
> in the U.S.
> …
> Q. . . . You didn't actually analyze what efforts SEI and its affiliates had made,
> did you?
> A. I reviewed some material that I had about the efforts they made and found it
> inconsequential, so I did not dwell -- I did not cover that in this paper.
> …
> Q. Okay. But this issue that's raised on page 4 [of Arlen's report] about
> adequately distribute TVP's programming, to be clear, you didn't undertake an
> analysis of how TVP's programming was distributed?
> A. I did not do an independent analysis of how TVP programming was
> distributed.
> Q. And you don't render any opinion or conclusion concerning the distribution
> methods, correct?
> A. That's correct.

(Id. at 111:25-113:13, 121:20.)  SEI's counsel then turned to the methodology Mr. Arlen used to

reach his conclusion about minimum subscriber levels by 2006.

> Q. Okay.  And what are the generally accepted methodologies for evaluating
> whether an exclusive licensee has met their obligation to maximize subscribers?
> A. Usually it's -- usually it's some level of penetration, reasonable level of
> household penetration.
> …
> Q. -- did you search for any literature or text, you know, setting forth any sort of
> objective standard for setting a reasonable penetration rate?
> A. I did not do any specific analysis for this report.
> Q. For any report?

> A. Based on 30-plus years experience, I draw on my industry knowledge.
> Q. Okay.   So, not only is your industry knowledge saying that there's an obligation, but your industry knowledge is now telling us what is some sort of objective standard for coming to a reasonable penetration rate; is that correct?
> A. That's right.

(Id. at 138:3-139:9.)

Mr. Arlen's knowledge and forty years of experience in the media industry, as outlined above, are sufficient to qualify him as an expert.  Further, Mr. Arlen's deposition testimony and report and Mr. Reyes's report create an issue of fact as to whether SEI breached the Contract. SEI is correct in pointing out Mr. Arlen did not specifically analyze the time period from August 11, 2009 to the present for appropriate subscriber levels. (Id. at 152:16-23.)  However, his analysis and conclusions create doubt as to SEI's efforts to maximize subscribers after the Settlement Agreement, especially considering Mr. Arlen's report indicates SEI's actual subscriber count was 45,000 users in April of 2012. (Wenger Decl., Arlen Rept., Ex. 10, p. 26, Dkt. No. 30-10.)  While SEI's probing of Mr. Arlen may raise questions to a jury about the soundness of his methodology and opinions, his report in conjunction with Mr. Reyes's analysis of the website create a genuine issue of material fact, which allows TVP to survive summary judgment.

iii.   *Notice and Opportunity to Cure*

SEI asserts TVP is contractually required to give SEI notice and an opportunity to cure before TVP can sue on its breach of contract claim.  Section 10.2 of the Contract states:

> 2. Each party may terminate this Agreement if the other party commits a significant violation of its provisions.  In case of such violation, this Agreement may be terminated within 90 days of receipt by the offending party of notification in which the notifying party will indicate violations and those will not be corrected by the offending party.  If the significant violation cannot be corrected, this Agreement will be terminated if the violation is repeated within 1 year.

20

(Piskora Decl., Ex. 5, Dkt. No. 26-6.)  SEI's argument conflates terminating the Contract with

TVP's ability to sue on the Contract.  In IMG Fragrance Brands v. Houbigant, the License

Agreement between the parties contained a provision similar to Section 10.2 of the Contract. See

IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 403 (S.D.N.Y. 2009)

(citation omitted) ("Section 17 of the License Agreement provides that a "party claiming a

breach or default shall promptly notify the other party, in writing . . . and shall provide [the

breaching party] with a right to cure the claimed default or breach, if curable, within thirty days .

. . .").  Judge Preska concluded, "[A] notice and cure provision like the one here provides a party

with a means of curing a default which would otherwise allow the non-defaulting party to

terminate the agreement; it does not constitute a condition precedent to a party's right to sue." Id.

(citing Ixe Banco, S.A. v. MBNA Am. Bank, N.A., No. 07-CV-0432 (LAP), 2008 WL 650403,

at *11 (S.D.N.Y. Mar. 7, 2008)).  The same is true in this case; the Contract requires notice and

opportunity to cure when a party seeks termination.  There is no language making such action a

condition precedent to filing a counterclaim. See Hypergraphics Press, Inc. v. Cengage Learning,

Inc., No. 08-C-5102, 2009 WL 972823, at *3 (N.D.Ill. Apr. 8, 2009) ("[I]n order for notice and

opportunity to cure to be a condition precedent to filing suit on the claim, the contract must so

state.").

   The remaining arguments regarding the breach of contract counterclaim are without merit

and as such, will not be addressed.  TVP's first counterclaim for breach of contract survives

summary judgment subject to the Court's previous ruling that any claim for damages accruing

prior to August 11, 2009 is barred.

21

### D. *Claim for Cancellation and/or Rescission*

The traditional grounds for setting aside written agreements, such as contracts and releases, include duress, illegality, fraud, or mutual mistake. Middle E. Banking Co., 821 F.2d at 907 (quoting Mangini v. McClurg, 24 N.Y.2d 556, 563 (1969)). Yet, TVP does not allege mistake or fraud. TVP seeks rescission based on SEI's willful failure to comply with its obligations and SEI's willful failure to act in good faith toward TVP. A party's breach of its obligations will only warrant rescission, as an extraordinary remedy, when it is material and fundamental so as to frustrate the intent of the parties and defeat the purpose of the contract. Septembertide Pub., B.V. v. Stein and Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989) ("[B]efore rescission will be permitted the breach must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'" (quoting Callaman v. Powers, 199 N.Y. 268, 284 (1910))). "Moreover, a '[f]ailure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient.'" K.M.L. Lab. Ltd. v. Hopper, 830 F.Supp. 159, 163 (E.D.N.Y. 1993) (quoting Callanan v. Keeseville, A.C. & L.C.R., 199 N.Y. 268, 284 (1910)). SEI and TVP have continued to perform substantially on the Contract since the execution of the Settlement Agreement despite the alleged breaches. There is nothing in the record indicating SEI's failure to perform its obligations, whether through underpayment of royalties or the failure to use reasonable efforts to obtain higher subscription levels, left the parties' deal fundamentally different from what was originally contemplated.

Contracts governed by New York law contain an implied duty of good faith. Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991) (citing Gelder Med. Group v. Webber, 41 N.Y.2d 680, 684 (1977)). Breach of this duty is treated as a breach of the underlying

22

contract. <u>Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro</u>, 961 F.2d 1052, 1056 (2d Cir. 1992) (citation omitted).  Here, even if TVP's allegations that SEI failed to act in good faith are taken as true, rescission is not an appropriate remedy where TVP has chosen to continue performance on the Contract. <u>See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.</u>, 103 F.Supp.2d 711, 736-37 (S.D.N.Y. 2000) (holding a non-breaching party cannot seek rescission, but is limited to seeking damages resulting from the breach, when its elects to continue to do business with the other party after the breaches); <u>ESPN, Inc. v. Office of Comm'r of Baseball</u>, 76 F.Supp.2d 383, 387 (S.D.N.Y. 1999) (stating if a party breaches a contract, the non-breaching party can continue the contract and recover damages for the breach).

TVP's second counterclaim for cancellation and/or rescission of the parties' agreements, including the Contract, the First Addendum, the Second Addendum, and the Settlement Agreement is dismissed in its entirety.

## IV.   Conclusion

For the reasons discussed above, Plaintiff's motion for partial summary judgment dismissing Defendant's counterclaims is GRANTED in part and DENIED in part.


**SO ORDERED.**


Dated:        New York, New York
              January  8  , 2013


                                          _____
                                          **ANDREW L. CARTER, JR.**
                                          **United States District Judge**